**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1) RONNIE DWAYNE SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:20-cv-00422-JFH-FHM** |
| | ) | |
| **(2)   BRET BOWLING, in his** | ) | **Jury Trial Demanded** |
| **Official Capacity,** | ) | **Attorney Lien Claimed** |
| **(3)   TURN KEY HEALTH CLINICS, LLC,** | ) | |
| **(4)   KERRI JANES, RN, in her** | ) | |
| **individual capacity** | ) | |
| **(5)   ANGEL BASS, LPN, in her** | ) | |
| **individual capacity** | ) | |
| **(6)   JYOTI PANDEY, FNP, in her** | ) | |
| **individual capacity** | ) | |
| **(7)   CODY SMITH, in his** | ) | |
| **individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

Plaintiff Ronnie Dwayne Smith, by and through his attorneys, Clark O. Brewster, Guy A. Fortney and Katie Arnold McDaniel, of BREWSTER & DE ANGELIS, PLLC, and for his claims against the Defendants, alleges and states as follows:

### I.        PARTIES, JURISDICTION AND VENUE

1.        This is a civil rights action brought under 42 U.S.C. § 1983, concerning the actions of all defendants and their agents and employees who were deliberately indifferent to the serious medical needs of Plaintiff.

2.        Plaintiff, Ronnie Dwayne Smith, is a resident of Creek County, Oklahoma.

3.        The acts and omissions which are the subject of this action occurred in Creek County, Oklahoma, in the United States District Court for the Northern District of Oklahoma.

1

4.      At the time of the events set forth herein, Ronnie Dwayne Smith was a pretrial detainee in the custody of the Creek County Sheriff's Department ("CSCO") being held at the Creek County Criminal Justice Center ("CCCJC or "Jail").

5.      Defendant Bret Bowling ("Sheriff Bowling" or "Defendant Bowling") is the Sheriff of Creek County, Oklahoma, residing in Creek County, Oklahoma, and acting under color of State law. Sheriff Bowling is sued in his official capacity.  Sheriff Bowling is the Creek County official responsible for promulgating and enforcing policies for the Creek County Criminal Justice Center ("CCCJC or "Jail"), providing medical care to inmates and pre-trial detainees, and operating the jail on a daily basis.

6.      Defendant Jail Administrator Cody Smith ("Defendant Smith") was the Jail Administrator at the CCCJC. At all times relevant hereto Defendant Smith was an employee and/or agent of CCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, during the time Plaintiff was in the custody of CCSO and housed at the CCCJC. At all times pertinent, Defendant Smith was acting within the scope of his employment and under color of State law. Defendant Jail Administrator Cody Smith is being sued in his individual capacity.

7.      Defendant Turn Key Health Clinics, LLC ("Defendant Turn Key") is an Oklahoma limited liability company doing business in Tulsa County, Oklahoma. Defendant Turn Key is a private correctional health care company that contracts with counties, including Creek County, to provide medical professional staffing, supervision, and care in county jails. Defendant Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision, treatment, evaluation, diagnostic testing, and medication to Smith while he was in the custody of the CCSO at the CCCJC. Defendant Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices, and protocols, that govern the provision of

medical and mental health care to inmates at the CCCJC, including acting as a "gatekeeper" for medical resources available to treat the medical needs of pretrial detainees during the time he was in the custody of CCSO and housed at the CCCJC, and for training and supervising its employees and agents. Defendant Turn Key was, at all times relevant hereto, endowed by Creek County with powers or functions governmental in nature, such that Defendant Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations. At all times pertinent hereto, Defendant Turn Key was acting under color of State law.

8.      Defendant Kerri Janes, RN ("Defendant Nurse Janes"), was at all times relevant hereto an employee and/or agent of Defendant Turn Key/CCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical and mental health needs were met, including acting as a "gatekeeper" for medical resources available to treat the medical needs of pretrial detainees during the time he was in the custody of CCSO and housed at the CCCJC. At all times pertinent, Defendant Nurse Janes was acting within the scope of her employment and under color of State law. Defendant Nurse Janes is being sued in her individual capacity.

9.      Defendant Angel Bass, LPN ("Defendant Nurse Bass"), was, at all times relevant hereto, an employee and/or agent of Defendant Turn Key/CCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical and mental health needs were met, including acting as a "gatekeeper" for medical resources available to treat the medical needs of pretrial detainees during the time he was in the custody of CCSO and housed at the CCCJC. At all times pertinent, Defendant Nurse Bass was acting within the scope of her employment and under color of State law. Defendant Nurse Bass is being sued in her individual capacity.

10.     Defendant Jyoti Pandey, FNP ("Defendant Nurse Pandey"), was, at all times relevant hereto, an employee and/or agent of Defendant Turn Key/CCSO, who was, in part, responsible for overseeing Plaintiff's health and well-being, and assuring that Plaintiff's medical and mental health needs were met, including acting as a "gatekeeper" for medical resources available to treat the medical needs of pretrial detainees during the time he was in the custody of CCSO and housed at the CCCJC. At all times pertinent, Defendant Nurse Pandey was acting within the scope of her employment and under color of State law. Defendant Nurse Pandey is being sued in her individual capacity.

11.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

12.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

13.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## II.     OPERATIVE FACTS

### A.     Summary of Facts

14.     Plaintiff hereby incorporates paragraphs 1-13 as though fully set forth herein.

15.     This case involves a pretrial detainee who suffered a severe spinal cord injury while in the custody of the CCSO.

16.     Plaintiff was denied medical treatment for diabetes.

4

17.     Plaintiff fell from the top bunk in his assigned cell within general population.

18.     Plaintiff spent much of the next four (4) days in quadriparesis, paralysis, soaked in his own urine, unable to feed himself, unable to drink, and in substantial pain.

19.     During those four (4) days medical and jail staff awaited validation that Plaintiff was faking rather than provide necessary and emergent medical care.

20.     No evidence of malingering or feigned injury ever developed.

21.     After four (4) days, Plaintiff was transferred to St. Francis Hospital, where he was diagnosed with spinal cord injuries requiring an emergent lifesaving operation.

22.     Plaintiff now has a lifelong handicap and loss caused by the permanent paralysis which limits his ability to perform daily living activities and requires the assistance of others.

**B.      Care and Treatment of Plaintiff Ronnie Smith**

23.     Plaintiff hereby incorporates paragraphs 1-22 as though fully set forth herein.

24.     On May 26, 2019, Plaintiff was booked into the CCCJC.

25.     Plaintiff is a medication dependent diabetic.

26.     Diabetes is a serious medical condition.

27.     Plaintiff reported to an unidentified nurse that he was diagnosed as diabetic and prescribed medication to treat it.

28.     Untreated diabetes commonly causes are fatigue, blurred vision, unsteadiness, weakness, and other symptoms which increase a person's risk of falling.

29.     Plaintiff was assigned to a top bunk in general population.

30.     Plaintiff was denied medication and treatment for his diabetes.

31.     The medical and detention staff, including the Defendants herein, knew of and were deliberately indifferent to Plaintiff's diabetes, failing to monitor and treat his serious medical condition.

32.     After three (3) days of not receiving treatment for his diabetes, Plaintiff fell from his assigned bunk.

33.     The fall caused Plaintiff to have a serious medical need, an injury to his neck and spine. The medical and detention staff, including the Defendants herein, were aware of Plaintiff's fall and serious medical needs.

34.     Plaintiff could not move and was in extreme pain.

35.     Inmates got the attention of Defendant Smith and informed him that Plaintiff needed help.

36.     Defendant Nurse Janes was called to the pod to evaluate Plaintiff.

37.     Defendants Nurse Janes and Smith knew that Plaintiff fell out of his bunk, he complained of severe pain in his neck and spine, could not walk, had leg spasms, and could not control his legs.

38.     Defendant Nurse Janes told Plaintiff he was faking.

39.     Defendant Nurse Janes did not to physically exam Plaintiff's neck and spine for injury.

40.     Defendant Nurse Janes did not assess Plaintiff's cranial nerve, central nervous system, leg rotation, or points of tenderness.

41.     Defendants Nurse Janes and Smith ignored Plaintiff's complaints of neck and spinal pain, extremity spasms, and the obvious risk of a spinal cord injury.

42.     Plaintiff's spine was not stabilized by jail or medical staff.

43.     Plaintiff was haphazardly jostled into a wheel chair.

44.     It is common knowledge in society, and to medical and detention staff in correctional institutions, that it should be assumed a person has a spinal cord injury if the person complains of severe pain in his neck or spine, the injury exerted substantial force on the spine or head, or the person complains of weakness, numbness, or paralysis, or lacks control of his or her limbs, bladder or bowels. A person suspected to have a spinal cord injury should not be moved, because permanent paralysis and other serious complications may result.

45.     Defendants Nurse Janes and Smith knew or should have known of the substantial risk of serious harm to Plaintiff that would occur if he was moved without stabilizing his spine.

46.     Defendant Nurse Janes and Smith acted with deliberate indifference and knew Plaintiff was mistreated after his fall.

47.     Plaintiff was never examined by a doctor, physician's assistant, nurse practitioner, or person otherwise adequately trained to make threshold decisions regarding care or evaluation of inmates with emergent medical injuries.

48.     Defendant Nurse Janes contacted Defendant Pandey by telephone.

49.     Defendant Nurse Janes denied that Plaintiff was injured.

50.     Defendant Pandey ordered non-emergent x-rays, which would be taken more than twenty-four (24) hours after Plaintiff's fall.

51.     The x-rays ordered were untimely and insufficient to diagnose Plaintiff's spinal cord injuries.

52.     Elaina Henderson, a CCCJC employee, characterized Defendant Turn Key's treatment plan as "keeping track on if he was able to move or not," per Defendant Nurse Janes' statements Plaintiff was faking.

53.     Defendant Nurses Janes and Pandey, Defendant Smith, and other jail and medical staff, disregarded the obviousness of Plaintiff's injuries to his neck and spine and knew, or should have known, that the spinal cord injuries mandated immediate and emergent treatment. Each knew or should have known that Plaintiff did not receive the care and treatment necessary to treat his spinal cord injury.

54.     A major spinal cord injury was so obvious and apparent that even a lay person would recognize the necessity for a doctor's immediate attention including, spinal stabilization, physical examination, imaging studies, and continued monitoring and assessment, to determine the extent of Plaintiff's injuries, which was unavailable at the CCCJC or medical staff was unwilling to provide.

55.     Defendant Nurses Janes and Pandey knew or should have known that the outcome of a spinal cord injury depended upon the accuracy, adequacy, and speed of first aid management, diagnosis, and treatment within the first few hours.

56.     Patients, like Plaintiff, who present with an incomplete injury may regain a large amount of useful function, or be spared the progression to complete injury with rapid diagnosis and treatment of fracture fragments, hematomas, or other lesions which compress the spinal cord.

57.     Patients, like Plaintiff, who are suspected of spinal cord injury should undergo frequent neurologic and vital sign checks, including orthostatic vital signs. This did not occur.

58.     Defendant Nurses Janes and Pandey refused to treat Plaintiff for his injuries. Defendant Nurses Janes and Pandey knew, or should have known, that failing to send him out for further evaluation by qualified medical personnel would cause unnecessary pain and a worsening of his condition.

59.     Rather than transfer him to a facility which could provide care for Plaintiff, Defendant Nurses Janes and Pandey ordered him placed in a "boat;" sent him out of the Medical Unit to unit JUV-E. Plaintiff remained in this non-medical cell for the rest of May 29, 2020, suffering from objectively obvious and observable paralysis and pain. Defendant Nurses Janes and Pandey, Jail Administrator Cody Smith and unidentified medical and detention staff left Plaintiff in peril to lie in his own urine.

60.     Defendant Nurses Janes and Pandey, Defendant Smith, and unidentified jail and medical staff, knew or should have known that Plaintiff's injuries were unmistakably real. Ignoring obvious signs and symptoms of a significant spinal cord injury, Defendant Nurses Janes and Pandy, and Defendant Smith, disregarded an excessive risk to Plaintiff's health and safety which they knew of, and was their duty, obligation, and responsibility to address.

61.     Intentionally denying and delaying medical treatment to Plaintiff, Defendant Nurses Janes and Pandey, Defendant Cody Smith, and unidentified jail and medical staff, failed to take reasonable measures to abate and treat Plaintiff's apparent spinal cord injury. Defendant Nurses Janes and Pandey, and other medical and jail staff who knew of obvious signs of Plaintiff's injury and of his mistreatment, delayed adequate medical treatment and/or transfer of Plaintiff to a facility where he could receive adequate care which caused unnecessary pain and worsening of Plaintiff's condition.

62.     Plaintiff did not receive any additional medical treatment on May 29, 2019. His blood sugar was not tested. He did not receive his medically necessary diabetic medication. Plaintiff's only known contact with other persons within the jail after he was transported out of the Medical Unit was with an unidentified detention staff, who brought dinner to Plaintiff. The detention officer who brought dinner to Plaintiff knew that Plaintiff was in extreme pain, was

9

paralyzed, and otherwise exhibited obvious signs and symptoms that Plaintiff needed additional medical treatment.  Plaintiff's need for additional treatment was so obvious that even a lay person would have recognized Plaintiff's condition presented an excessive risk to Plaintiff's health and safety.

63.     On May 30, 2019, twenty-seven (27) hours after his initial complaint and injury, Plaintiff's neck and spine were x-rayed.

64.     An unidentified detention officer confronted Plaintiff, stating that the Defendant Turn Key nurse stated he was "faking." Upon information and belief, the nurse was Defendant Nurse Janes.

65.     The unidentified detention office who confronted Plaintiff, knew that Plaintiff was in extreme pain, was paralyzed, had urinated on himself, and otherwise exhibited obvious signs and symptoms that Plaintiff needed additional medical treatment.

66.     Plaintiff did not receive his medically necessary diabetic medication. He was not given a diabetic diet, and his blood sugar was not monitored.

67.     While Plaintiff languished in JUV-E, Defendant Nurse Bass reported Plaintiff was a "No Show" for his medically necessary diabetic and pain medication. Defendant Nurse Bass knew that Plaintiff was prescribed medically necessary medication, but was deliberately indifferent to Plaintiff's need for medication. Defendant Nurse Bass knew that Plaintiff fell off of his bunk and complained of significant pain and paralysis. In blatant disregard of Plaintiff's serious medical needs, Defendant Nurse Bass chose to report Plaintiff as a "No Show" for his medication, instead of administering medication to him while he laid paralyzed in JUV-E.

68.     Medical and jail staff including Defendant Nurses Janes, Pandey, Bass, and Defendant Smith, intentionally delayed and denied Plaintiff medical care by only attempting to observe signs that he was "faking" rather than allowing him to receive medical treatment.

69.     Throughout May 30 and most of May 31, Plaintiff remained in JUV-E in a "boat" suffering from the objectively observable paralysis; unable to feed himself; unable to prevent urinating on himself; and laid in soiled clothing.  No one on the jail staff or medical staff took the time to assist him on his need for basic human sustenance of food, water, and cleanliness.

70.     Plaintiff's vitals were only taken twice between May 29, 2020, and June 1, 2020.

71.     Upon information and belief, Defendant Nurse Janes was on duty May 29, 2020, through May 31, 2020.

72.     Defendant Nurses Janes, Pandey, and/or other Defendant Turn Key medical staff or detention staff, did not further evaluate Plaintiff's medical condition on May 30th or 31st and continued to state and inform other jail staff that Smith was "faking" his injury.

73.     On May 31st at 9:42 pm (fifty-nine (59) hours after his initial complaint and injury), Plaintiff was moved back to the medical unit for "observation," for signs that he was "faking" an injury.

74.     Around midnight, Defendant Nurse Bass spoke with Plaintiff. Plaintiff told her that he could no longer control his body functions. He could not help but urinate on himself, stating "I have laid in my pee because I can't control it." Plaintiff was "unable to grab things with his hands or feel them. They're numb so [were his] arms but [he could] kind of feel them."  Plaintiff also told the medical staff including Defendant Nurse Bass that "he wasn't able to stand to get up out of the floor or turn himself while lying down," remaining in a state of quadriparesis. Quadriparesis is a condition characterized by weakness in all four limbs (both arms and both legs).

75.     Defendant Nurse Bass was aware that Plaintiff reported he was in pain and paralyzed for the past fifty-nine (59) hours.

76.     Defendant Nurse Bass spoke to Defendant Nurse Pandey by telephone following Defendant Nurse Bass' contact with Plaintiff. Defendant Nurse Pandey was aware that Plaintiff complained of pain and paralysis, and had been expressing these same complaints for the past fifty-nine (59) hours. Defendant Nurse Pandey knew that Plaintiff's condition did not improve and had worsened, and that his pain was unabated.

77.     Despite the knowledge that Plaintiff had been suffering without change for the past fifty-nine (59) hours, Defendant Pandey refused to send Plaintiff out for further evaluation by qualified medical personnel, including immediate radiological studies to determine the extent of Plaintiff's injuries which were unavailable at the CCCJC. Her actions caused unnecessary pain and a worsening of his condition and failed to mitigate an unnecessary risk of harm that she knew or should have known of.

78.     Despite knowledge of Plaintiff's continued paralysis and soiled clothing, Defendant Nurses Janes, Bass, Pandey and other Defendant Turn Key medical personnel and jail staff, continued to show deliberate indifference to Plaintiff's condition by refusing to treat him for his injuries and send him out for further evaluation by qualified medical personnel.

79.     Records reflect that with knowledge of his inability to move or "fully function his body" both jail and medical staff held him for observation for several days to see if they could catch him moving under the non-medical diagnosis that Plaintiff was "faking."  On the fourth day, "he was still the same and [he] sent him out with EMSA."

80.     Despite the serious medical condition exhibited by Plaintiff, he was never examined by a medical doctor between May 29th and June 1st at the CCCJC.

12

81.     Pain medication was either not administered or not effective to treat Plaintiff's pain. Plaintiff informed jail and medical staff that he was in continual and significant pain that was unabated after his fall.

82.     Individuals who had knowledge of Plaintiff's condition but were indifferent to his condition from May 29th through June 1st include but are not limited to "DO Finley"; Cody Smith; Elaina Henderson; Eric Thompson; Defendant Kerri Janes; Defendant Angel Bass; and Defendant Jyoti Pandey; the nurse who conducted Plaintiff's initial medical screening; the detention officer who assigned Plaintiff to an upper bunk in general population; and the individual(s) who did not evaluate and treat Plaintiff's diabetic condition. Each individual knew, or should have known, that the failure to monitor and treat Plaintiff's diabetes and properly assess Plaintiff's spinal cord injury posed an excessive risk to his health or safety.  Unidentified medical personnel and detention staff include but are not limited to Detention Officer 1269, the nurse who performed the intake assessment, and other jail and medical staff who knew of Plaintiff's medical needs and were responsible Plaintiff's care and treatment.

83.     On June 1, 2019, (seventy-three (73) hours after his initial complaint and injury), after laying in his own urine, unable to fully function his body for four days, and unable to feed himself, Plaintiff was examined by Nurse Wallace who, in the words of Corporal Eric Thompson, "did a few things to see if he was faking or not," determined that Plaintiff needed further medical evaluation after a fall four (4) days prior, and requested that Plaintiff be transferred *via* in ambulance to St. Francis Hospital in Tulsa, Oklahoma.

84.     Plaintiff arrived at St. Francis Hospital on June 1st at 1:36 pm. He was diagnosed with Cord Compression at C5-6; Cord Contusion at C5-6; Traumatic Disc herniation at C5-6; Cervical Spondylosis at C5-6; and Quadriparesis with Central Cord Syndrome.  His condition

required immediate surgical intervention to relieve the compression and contusion.  The emergent operation, anterior cervical discectomy and fusion, occurred at 11:53 pm, the same day of admission (84 hours after his initial complaint and injury) to relieve the contusion and cord compression by large anterior osteophytes.

85.     Post-surgery, Plaintiff remained hospitalized for thirty (30) days in rehabilitation to begin to cope with the permanent changes to his standard of living and continued quadriparesis from the effects of a traumatic spinal cord injury and delay in surgical intervention.

86.     Due to the delay of treatment of a serious spinal cord injury, Plaintiff has a lifelong handicap and loss caused by the permanent paralysis which limits his ability to perform daily living activities and requires the assistance of others.  Such injuries and loss meet the criteria for substantial harm.

87.     Jail personnel did not provide Plaintiff with even minimally adequate medical care for his acute and emergent needs and made little effort to transfer him to a hospital, despite his numerous complaints that he was experiencing a medical emergency.

**C.     The Medical Care at the CCCJC**

88.     Plaintiff hereby incorporates paragraphs 1-87 as though fully set forth herein.

89.     The supervisory responsibilities of Sheriff Bowling include the supervision of the jail staff and Defendant Turn Key and its staff used to provide medical care at the CCCJC.

90.     Defendant Turn Key first contracted with Creek County and Sheriff Bowling for the medical staffing and administration to provide "for all medical care for all inmates" in the CCCJC in July of 2015 for a term of one year.  The contract provided that Sheriff Bowling reserved the right to supervise and the medical staff employed by Defendant Turn Key.  Further, Sheriff Bowling had the authority and key decision-making ability to terminate the contract upon written

notice to Defendant Turn Key.  The contract was renewed in July of 2016, 2017, 2018, 2019 and 2020.

91.     During this time frame and prior to May 29, 2019, there have been four (4) civil rights cases filed concerning the medical care and treatment of pretrial detainees at the CCCJC by Defendant Turn Key including:

a.      Philip Sanders for the denial of medical care to inmates including Brenda Jean Sanders which resulted in her death in 2016.  The case is still pending in the Northern District of Oklahoma, NDOK Case No. 4:17-cv-492-JED-FHM;

b.      Kelley Foutch for the denial of medical care to inmates including Russell Foutch which resulted in his death in 2016. Foutch alleged that over the course of a week, Russell's condition deteriorated from a cold which was ignored and ended with being pronounced dead within 45 minutes of transport to a local hospital. The case has been dismissed without prejudice. NDOK Case No. 4:17-cv-431-GKF-JFJ;

c.      Janice Bush for the denial of medical care to inmates including Ronald Garland which resulted in his death in 2017. Janice Bush also claims that Nurse Kerri Janes, defendant herein, exhibited reckless indifference to Garland's medical condition and chose to disregard it. The case is still pending in the Northern District of Oklahoma, NDOK Case No. 4:19-cv-98-GKF-JFJ;

d.      Larry Holland for the denial of medical care to inmates including his son, Floyd Holland which resulted in his death in 2017. Larry Holland also claims that Defendant Turn Key medical staff at CCCJC failed to appreciate the significant injury to his son on November 9, 2017, after a fall which caused a spinal

15

cord injury and limited his "ability to ambulate in the jail." Like Plaintiff, Holland's condition continued to deteriorate resulting in an inability to walk, get water and left him to urinate on himself as he could not get to the toilet. The Defendant Turn Key staff complained of as exhibiting deliberate indifference to the medical care and treatment of Holland include Nurse Kerri Janes, defendant herein. The case is still pending in the Northern District of Oklahoma, NDOK Case No. 4:19-cv-663-JFH-JFJ.

92.     Each of these cases above provided Defendant Sheriff Bowling and Defendant Turn Key with clear prior notice of the deficiencies and indifference of Defendant Turn Key and its medical staff, including Nurse Janes, and that they were failing to provide medical care to pretrial detainees.

93.     Each of these cases above provided notice that Defendant Turn Key failed to have a protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs and provides no guidance to its medical staff regarding the appropriate standards of care for inmates with severe injuries, including spinal cord injuries.

94.     Each of these cases above provided notice to Sheriff Bowling that Defendant Turn Key failed to have a protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs as "gatekeepers" who must be prepared to provide access to medical personnel capable of evaluating and treating complex or serious medical needs including but not limited to spinal cord injuries.

95.     Each of these cases above provided notice to Sheriff Bowling that Defendant Turn Key failed to supervise, monitor and train its medical staff, including the Defendant Nurses herein,

with respect to the medical monitoring and care of inmates with complex or serious medical needs, and appropriate standards of care for inmates with severe injuries including spinal cord injuries.

96.     Each of these cases above provided notice to Sheriff Bowling that Defendant Turn Key has failed to supervise, monitor and train its medical staff, including the Defendant Nurses herein, with respect to medical monitoring and care of inmates with complex or serious medical needs as "gatekeepers" who must be prepared to provide access to medical personnel capable of evaluating and treating complex or serious medical needs including but not limited to spinal cord injuries.

97.     Notwithstanding notice of unconstitutional policies, practices, customs, and/or patterns, and failures to supervise, monitor, and train, nothing was done by Defendant Turn Key or Defendant Sheriff Bowling to respond to the unreasonable risk to pretrial detainees caused by the constitutionally deficient medical care by Turn Key.

**FIRST CAUSE OF ACTION**
*Deprivation of Federal Civil Rights, 42 U.S.C. § 1983*
*Defendant Nurses Janes, Bass, Pandey, and Defendant Smith*

98.     Plaintiff hereby incorporates paragraphs 1-97 as though fully set forth herein.

99.     The violations of Plaintiff's constitutional rights occurred as a direct and proximate cause of the intentional, arbitrary and malicious acts of Defendant Turn Key personnel and jail staff including Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, acting under the color of law. The conduct, when viewed in its totality and compared with reasonably accepted standards of conduct, must be characterized as exhibiting deliberate indifference to the constitutional rights of Plaintiff, intending to cause harm and deprive him of the civil liberties granted to him under the Federal Constitution. The actions of the individual Defendants were willful, arbitrary and shocking to the conscience of civilized society. Plaintiff has suffered grievous

mental, physical and emotional pain resulting from the deliberate denial of medical care.  The acts and omissions under the color of law based upon the facts as outlined above, include, but are not limited to, the following:

a. On May 29th and continuing everyday thereafter until June 1st, Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, disregarded the obviousness of Plaintiff's injuries to his neck and spine and knew, or should have known, that the spinal cord injuries mandated stabilization and immediate and emergent treatment.

b. Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, knew or should have recognized that Plaintiff's spinal cord injury required a doctor's immediate assessment including imaging studies to determine the extent of Plaintiff's injuries which was unavailable at the CCCJC.

c. Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, knew or should have known that the treatment of a spinal cord injury within the first few hours of occurrence can relieve unnecessary pain and harm caused by any delay in diagnosis and treatment.

d. Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, knew, or should have known, that failing to send Plaintiff out for further evaluation by qualified medical personnel would cause unnecessary pain and a worsening of his condition.

e. By intentionally denying and delaying medical treatment to Plaintiff, Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, failed

to take reasonable measures to abate and treat Plaintiff's apparent spinal cord injury causing unnecessary pain and worsening of Plaintiff's condition.

        f.       Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, also failed in their roles as "gatekeepers" by preventing Plaintiff from receiving treatment and denying him access to medical personnel capable of evaluating and treating his spinal cord injury.

100.    The acts and omissions described above by the Defendant Nurses Janes, Bass and Pandey, and Defendant Smith herein violated clearly established statutory and/or constitutional rights of which a reasonable person would have known.

101.    As a result of the conduct of Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, as described above, the decedent suffered damages in the form of mental, physical and emotional pain in violation of his rights under the Fourteenth Amendment as a pretrial detainee and the violation of provisions of the Civil Rights Act of 1871, 42 U.S.C. §1983 and is entitled to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee along with all other such relief as is deemed just and equitable.

102.    Further, the conduct of the Defendant Nurses Janes, Bass and Pandey, and Defendant Smith, was willful, wanton, malicious, shocking to the conscience exhibiting the required deliberate indifference and intended to induce lawlessness, terrorize, cause harm to the Plaintiff herein and therefore warrants the imposition of exemplary damages against Defendant Nurses Janes, Bass and Pandey in excess of Seventy-Five Thousand Dollars ($75,000.00).

## SECOND CAUSE OF ACTION
### *Deprivation of Federal Civil Rights, 42 U.S.C. § 1983*
### *Creek County Sheriff Bret Bowling, in his Official Capacity*

103.    Plaintiff incorporates paragraphs 1-102 as though fully set forth herein.

104.    The acts and omissions for which the Defendant Bret Bowling is liable in his official capacity under supervisory liability to the above described acts include, but are not limited to, the following:

a.    The establishment of a policy, practice and custom within the CCSO and the jail administered by him to provide constitutionally deficient medical care through the retention of Defendant Turn Key at the CCCJC, when he knew or should have known through the prior lawsuits that Defendant Turn Key, the medical staff and the Defendant Nurses herein represented an unreasonable risk to the health and safety of pretrial detainees in his custody including Plaintiff.

b.    The establishment of a policy, practice and custom within the CCSO and the jail administered by him to provide constitutionally deficient medical care through the retention of Defendant Turn Key at the CCCJC when he knew or should have known that Defendant Turn Key, the medical staff and the Defendant Nurses herein were failing in their roles as "gatekeepers" by preventing access to medical personnel capable of evaluating and treating complex or serious medical needs including but not limited to spinal cord injuries.

c.    Deliberate indifference to Turnkey's failure to supervise, monitor, and train its medical staff, and its unconstitutional widespread policies, practices, patterns, and/or customs, with respect to:

1.    Failures to administer medically necessary medication to inmates;

20

2.     Noncompliance with required state medical and jail standards regarding procedures for care for acute and emergency situations, including protocols for assessment of inmates suspected of spinal cord injuries;

3.     Reliance on low-level providers, and hiring and retention of poor quality and inadequately trained staff, who make threshold decisions regarding care or evaluation of inmates with emergent medical injuries;

4.     Underutilization diagnostic techniques and technologies; and

5.     Refusal to provide treatment and adequate monitoring to inmates who demonstrate obvious signs or symptoms of a serious medical need and instead placing them in "observation" for signs or malingering or "faking."

d.     Sheriff Bowling acted recklessly when he failed to act properly supervise and monitor the contract for medical services with Defendant Turn Key when he knew or should have known that Defendant Turn Key, the medical staff and the Defendant Nurses herein posed an excessive risk to health or safety of the pretrial detainees including Plaintiff.

105.   These acts and omissions on the part of Sheriff Bowling outlined above, constitute a deliberate indifference to the constitutional rights of the citizens in their custody including the Plaintiff herein and was the direct and proximate cause of violations of his constitutional rights. Such policies were the moving force behind the constitutional violations alleged and suffered by the Plaintiff.

106.   As a result of the supervisory failures outlined above by Sheriff Bowling, in his Official Capacity, the Plaintiff suffered damages in the form of mental, physical and emotional pain in violation of his rights under the Fourteenth Amendment as a pretrial detainee and the

violation of provisions of the Civil Rights Act of 1871, 42 U.S.C. §1983 and is entitled to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee along with all other such relief as is deemed just and equitable.

### THIRD CAUSE OF ACTION
*Deprivation of Federal Civil Rights*
*42 U.S.C. § 1983 – Monell Liability*
*Turn Key Health Clinics, LLC*

107.    Plaintiff incorporates paragraphs 1-106 as though fully set forth herein.

108.    Defendant Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

109.    Defendant Turn Key is charged with implementing and assisting in developing the policies of CCSO with respect to the medical and mental health care of inmates at the CCCJC and has shared responsibility to adequately train and supervise its employees.

110.    Defendant Turn Key had a legal duty to provide medical care to Plaintiff and other inmates, and Defendant Turn Key breached its duty to provide Plaintiff reasonably adequate medical care, which resulted in a violation of his constitutional rights.

111.    Defendant Turn Key, as the medical contractor at the CCCJC, is an official policymaker for medical care at the facility.

112.    Defendant Turn Key implements, maintains, and imposes, its own corporate policies, practices, protocols and customs at the Jail.

113.    Defendant Turn Key failed to supervise, monitor, and train its medical staff, and had unconstitutional widespread policies, practices, patterns, and/or customs, with respect to:

    a.    Failures to administer medically necessary medication to inmates;

b.      Noncompliance with required state medical and jail standards regarding procedures for care for acute and emergency situations, including protocols for assessment of inmates suspected of spinal cord injuries;

c.      Reliance on low-level providers, and hiring and retention of poor quality and inadequately trained staff, who make threshold decisions regarding care or evaluation of inmates with emergent medical injuries;

d.      Underutilization diagnostic techniques and technologies;

e.      Refusal to provide treatment and adequate monitoring to inmates who demonstrate obvious signs or symptoms of a serious medical need and instead placing them in "observation" for signs or malingering or "faking"; and

f.      Failure to fulfill the "gatekeeper role," in refusing to timely transfer inmates with serious fall injuries for obviously necessary evaluation and treatment by qualified medical personnel.

114.    Defendant Turn Key employees, including but not limited to Defendants Janes, Bass, and Pandey, were deliberately indifferent to Plaintiff's known serious medical issues. The acts and omissions of Defendant Turn Key employees rise to the level of a constitutional violation for basis of a municipal liability theory.

115.    There is an affirmative causal link between the deliberate indifference to Plaintiff's serious medical needs, his safety and the violations of his civil rights, and the customs, policies, and/or practices carried out by Defendant Turn Key.

116.    Defendant Turn Key knew, or should have known due to its obviousness, that its policies, practices and/or customs posed substantial risks to the health and safety of Plaintiff.

23

117.    Defendant Turn Key failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates, including Plaintiff.

118.    Defendant Turn Key tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

119.    As a result, Plaintiff suffered damages in the form of mental, physical and emotional pain in violation of his rights under the Fourteenth Amendment as a pretrial detainee and the violation of provisions of the Civil Rights Act of 1871, 42 U.S.C. §1983 and is entitled to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee along with all other such relief as is deemed just and equitable.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against the Defendants for actual and compensatory damages, including punitive damages against the individual defendants, the costs of this action, a reasonable attorneys' fee, interest as provided by law, and for all other further relief this Court deems just and proper.

Respectfully submitted,

By: */s/ Guy A. Fortney*_____
        Clark O. Brewster, OBA #1114
        Guy A. Fortney, OBA #17027
        Katie A. McDaniel, OBA #32345
        BREWSTER & DE ANGELIS
        2617 E. 21st
        Tulsa, Oklahoma 74114
        (918) 742-2021
        *Attorneys for Plaintiff*