IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RONNIE DWAYNE SMITH,<br><br>Plaintiff,<br><br>v.<br><br>BRET BOWLING, in his official capacity as Sheriff of Creek County, et al.,<br><br>Defendants. | Case No. 20-CV-422-JFH-CDL |

## ORDER AND OPINION

Before the Court are motions to dismiss filed Defendants Kerri Janes, RN ("Nurse Janes"), Angel Bass, LPN ("Nurse Bass"), Jyoti Pandey, FNP ("Nurse Pandey"), and Turn Key Health Clinics, LLC ("Turn Key"). Dkt. No. 10; Dkt. No. 16; Dkt. No. 19; Dkt. No. 21. Plaintiff Ronnie Dwayne Smith ("Plaintiff") brings claims against these Defendants—as well as against Defendants Bret Bowling in his official capacity as Sheriff of Creek County ("Bowling") and Cody Smith ("Smith")[1]—alleging constitutional violations in the medical care he received while detained at the Creek County Criminal Justice Center (the "Jail") in May 2019. Dkt. No. 4. For the reasons stated herein, the motions to dismiss filed by Nurse Janes, Nurse Pandey, and Turn Key are DENIED and the motion to dismiss filed by Nurse Bass is GRANTED.

## STANDARD

In considering a motion under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the

---

[1] Bowling and Smith have filed answers to Plaintiff's complaint and do not move for dismissal of any claims against them. Dkt. No. 9; Dkt. No. 11.

1

elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 562. Although decided within an antitrust context, *Twombly* stated the pleadings standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to claimant. *Twombly*, 550 U.S. at 555; *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007); *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. *Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs,* 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

## FACTUAL BACKGROUND

Taking Plaintiff's allegations as true and construing them in the light most favorable to Plaintiff, as it must at this stage, the Court briefly recounts the allegations. Dkt. No. 4. Plaintiff was booked into the Jail on May 26, 2019. *Id.* at ¶ 24. At an unspecified time, he reported to medical staff that he is diabetic and dependent on diabetes medication. *Id.* at ¶¶ 25-27. Plaintiff did not receive medication or other treatment for his diabetes while at the Jail. *Id.* at ¶ 30.

Plaintiff was assigned to a top bunk at the Jail, from which he fell on May 29, 2019. *Id.* at ¶¶ 29, 32.[2] Plaintiff injured his neck and spine in the fall. *Id.* at ¶ 33. Nurse Janes (a registered nurse) evaluated Plaintiff directly after his fall, where Plaintiff reported to her severe pain, leg spasms, and inability to walk or otherwise control his legs. *Id.* at ¶¶ 36-37. Nurse Janes told Plaintiff she believed he was faking his injuries and did not physically examine Plaintiff, perform a nervous system assessment, or stabilize Plaintiff's spine. *Id.* at ¶¶ 38-42. At some point during this interaction, Plaintiff was "jostled" into a wheelchair. *Id.* at ¶ 43. Nurse Janes called Nurse Pandey (a nurse practitioner) about Plaintiff's reported injuries. *Id.* at ¶ 48. Although Nurse Janes told Nurse Pandey she believed Plaintiff was faking, Nurse Pandey ordered x-rays of Plaintiff's neck and spine. *Id.* at ¶¶ 49-50. Nurse Janes and Nurse Pandey then had Plaintiff placed in a "boat" and sent to a non-medical unit. *Id.* at ¶ 59. Plaintiff did not receive diabetic medication or blood sugar monitoring in this non-medical unit. *Id.* at ¶¶ 62, 66. During this time, Nurse Bass (a licensed practical nurse) marked Plaintiff as a "no show" for medication. *Id.* at ¶ 67.

On May 30, 2019—the day after Plaintiff's fall—his neck and spine were x-rayed. *Id.* at ¶ 63.[3] Plaintiff was then returned to the non-medical unit, where he was held in the same "boat." *Id.* at ¶ 69. He remained in this situation throughout May 30 and May 31, 2019, at points soiling himself and demonstrating an inability to feed himself. *Id.* At least two Jail employees referenced Nurse Janes' theory that Plaintiff was faking his injuries: Elaina Henderson described Plaintiff's treatment plan as "keeping track [of] if he was able to move or not" and an unidentified detention

---

[2] While Plaintiff pleads that "untreated diabetes commonly causes are [sic] fatigue, blurred vision, unsteadiness, weakness, and other symptoms which increase a person's risk of falling," he does not indicate whether he experienced any of these symptoms himself during his time at the Jail. *Id.* at ¶ 28.

[3] Plaintiff does not describe the results of the x-rays in his complaint. *Id.* at ¶ 51.

3

officer said that a Turn Key nurse had concluded Plaintiff was faking. *Id.* at ¶¶ 52, 64. Turn Key staff, including Nurses Janes and Pandey, informed other Jail staff throughout May 30 and 31, 2019 that Plaintiff was faking his injuries. *Id.* at ¶ 72.

In the evening of May 31, 2019—two and a half days after Plaintiff's fall—Plaintiff was moved to the medical unit for observation. *Id.* at ¶ 73. He reported to Nurse Bass and other staff that he could not control his urinary function, was experiencing numbness and weakness in his hands and arms, could not stand, and could not turn over while laying down. *Id.* at ¶ 74. Nurse Bass relayed this information to Nurse Pandey by telephone, who decided against sending Plaintiff for further treatment. *Id.* at ¶¶ 76-77. Medical records from this time reflect that Plaintiff could not move or "fully function his body." *Id.* at ¶ 79.

On June 1, 2019, another Turn Key nurse examined Plaintiff, determined he needed further medical evaluation, and recommended he be taken to a hospital. *Id.* at ¶ 83. Plaintiff was transported to St. Francis Hospital in Tulsa, Oklahoma, where he was diagnosed with spinal cord compression, cord contusion, traumatic disc herniation, cervical spondylosis, and quadriparesis with central cord syndrome, and underwent emergency surgery to address the cord compression and contusion. *Id.* at ¶ 84. Plaintiff was hospitalized for thirty (30) days of recovery and now has a permanent handicap. *Id.* at ¶¶ 85-86.

Turn Key operated under a contract with Bowling to provide all medical care to inmates at the Jail. *Id.* at ¶ 90. Since the initial contract period began in 2015, Turn Key has been named in five lawsuits alleging deliberate indifference by Turn Key staff at the Jail. *Id.* at ¶ 91. Each lawsuit alleges that Turn Key had serious protocol and policy deficiencies regarding medical monitoring and care of inmates and failed to train individual employees regarding the appropriate standards of care. *Id.* at ¶¶ 93-96. These protocol and policy deficiencies appeared in six areas: failure to

administer medically necessary medication to inmates; failure to comply with state medical and jail standards regarding acute and emergency care; reliance on low-level providers and hiring and retention of inadequate staff; underutilization of diagnostic techniques and technologies; refusal to provide treatment and monitoring to inmates whom staff believed to be feigning injury; and failure to fulfill gatekeeping roles of referring inmates to higher-level providers in emergency situations. *Id.* at ¶ 113.

## AUTHORITY AND ANALYSIS

Plaintiff brings deliberate indifference claims against the individual Nurse Defendants and a *Monell* municipal liability claim against Turn Key.

### I. Individual Defendants

#### A. Qualified Immunity

Nurse Janes, Nurse Bass, and Nurse Pandey (collectively the "Nurse Defendants")—who are employed by Turn Key, a private entity—claim they are entitled to qualified immunity. Dkt. No. 16 at 11; Dkt. No. 19 at 10; Dkt. No. 21 at 10. "Under the qualified immunity doctrine, 'government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.'" *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Nurse Defendants' qualified immunity argument is squarely foreclosed by the Tenth Circuit's decision in *Tanner v. McMurray*, 989 F.3d 860, 865 (10th Cir. 2021), where the circuit joined the "near uniformity" of other circuits in holding that "corporate medical contractors are not entitled to assert qualified immunity." *Id.*

### B. Deliberate Indifference

A person who believes he or she has suffered a "deprivation of any rights, privileges, or immunities secured by the Constitution at law" may bring a civil action against any person who, acting under color of law, caused that deprivation. 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Supreme Court first recognized deliberate indifference as a theory of § 1983 liability in 1976, reasoning that severe inattention "to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation omitted). The doctrine has a high bar. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner," *id.* at 106, and "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation," *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001). Nor does negligence or gross negligence by officials rise to the level of deliberate indifference, as "Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) ("Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim."). Instead, deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.*

"The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021). To prove a claim for violation of a right to medical care, a pretrial detainee "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020) (quoting *McBride v. Deer*, 240 F.3d 1287, 1289 (10th Cir. 2001)). Deliberate indifference is made up of two components: objective and subjective. *Id.* at 993 (rejecting pretrial detainee's argument that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), established a purely objective standard for pretrial detainees' claims related to medical care).

1. **Objective Component**

"Under the objective inquiry, the alleged deprivation must be sufficiently serious to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quotations omitted). "A medical need is [objectively] serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Strain*, 977 F.3d at 989 (quoting *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (modification in original)). Still, delay in providing care for an objectively serious medical need "only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "Substantial harm" includes death as well as "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

Plaintiff plausibly describes objectively serious medical needs of diabetes and spinal injury. *See Bond v. Regalado*, Case No. 18-CV-231-GKF-CDL, 2021 WL 3559041, at *3 (N.D.

Okla. Aug. 11, 2021) (concluding diabetes satisfied the objective component where evidence at summary judgment indicated that diabetes was poorly controlled); *Thurman v. Cnty. Comm'rs of Okla. Cnty.*, Case No. CIV-17-950-G, 2019 WL 4462647, at *4 (W.D. Okla. Apr. 30, 2019) (concluding neck injury satisfied the objective component where injury necessitated spinal surgery), *R&R adopted by* 2019 WL 3318120.

### 2. Subjective Component

The subjective component of deliberate indifference "is akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self*, 439 F.3d at 1231 (quotations omitted). A plaintiff must "establish that a medical 'official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Strain*, 977 F.3d at 990 (quoting *Mata*, 427 F.3d at 751) (alteration in original).

The Court's analysis of the subjective component "is limited to consideration of [a] doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Self*, 439 F.3d at 1233. Exercise of medical judgment, even if flawed, does not satisfy the subjective component "absent an extraordinary degree of neglect." *Id.* at 1232. Where a medical professional does not have final treatment authority and instead acts "solely . . . as a gatekeeper for other medical personnel capable of treating the condition," that professional may be liable if she "delays or refuses to fulfill that gatekeeper role." *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)).

Neither negligent diagnosis nor treatment establish a constitutional violation, *Self*, 439 F.3d at 1230, and "an official's failure to alleviate a significant risk that he should have perceived but

did not, while no cause for commendation, cannot under [Supreme Court precedent] be condemned as the infliction of punishment," *Farmer*, 511 U.S. at 838. "In the end, the 'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999)).

The Tenth Circuit has provided at least two examples of the "extraordinary degree of neglect" needed to satisfy the subjective component. First, the court "concluded the subjective component might be met" where a physician's assistant "failed to summon an ambulance despite candidly admitting that, had he known about [an] inmate's chest pains, he would have done so" and "the facts supported an inference he knew about the chest pains yet intentionally disregarded his practice of summoning an ambulance." *Self*, 439 F.3d at 1231 (emphasis omitted) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1211-12 (10th Cir. 2000)). Similarly, the court concluded "it was clear [a] case involved more than a 'mere disagreement between the parties'" where an inmate had black gangrenous tissue on his hand, the inmate repeatedly informed a doctor of his condition, and the doctor noted the inmate's symptoms but did not treat them. *Id.* (quoting *Oxendine*, 241 F.3d at 1277 & n.7).

The Court believes Plaintiff has plausibly described an "extraordinary degree of neglect" by two of the three Nurse Defendants. Most crucially, Nurse Janes responded to Plaintiff's fall and concluded that he was faking without performing any physical exam or stabilization. This evidences a clear disregard of the well-known risk of cervical spine injury after a fall from a significant height[4] and goes beyond negligence. Nurse Janes' repeated insistence to other staff

---

[4] Risk of serious complications from spinal injuries is common knowledge. *See, e.g.*, *Spinal injury: First aid*, Mayo Clinic (May 25, 2021), https://www.mayoclinic.org/first-aid/first-aid-spinal-injury/basics/art-20056677 ("If you suspect a back or neck (spinal) injury, **do not move the**

that Plaintiff was feigning injury despite her failure to examine him further plausibly describes deliberate indifference because Nurse Janes' assertions potentially obstructed evaluation by other medical staff.

Nurse Pandey did not demonstrate extraordinary neglect in her first response to Plaintiff's situation, as she ordered x-rays despite Nurse Janes' opinion that Plaintiff was feigning injury. While Plaintiff takes issue with the non-emergent status of the x-rays, this timing decision falls within the realm of medical judgment. The Court's analysis is different for Nurse Pandey's second interaction with Plaintiff's condition, however, which occurred two days after his injury when medical records indicated he could not move or "fully function his body." At this point, Plaintiff had told several Jail staff that he could not control his urinary function, was experiencing numbness and weakness in his hands and arms, could not stand, and could not turn over while laying down. However, Nurse Pandey denied sending Plaintiff for further examination or treatment. This is akin to the situation considered by the Tenth Circuit to fulfill the subjective component in *Oxendine*, 241 F.3d at 1277, where a doctor noted severe symptoms but did not treat the patient for those symptoms, and thus plausibly establishes the subjective component of deliberate indifference. *See also Lucan v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim.").

The Court does not believe Plaintiff has plausibly described an "extraordinary degree of neglect" by Nurse Bass. He alleges first that Nurse Bass marked him as a "no show" at a medication dispensing opportunity, and second, that Nurse Bass relayed information to Nurse Pandey on the evening that Nurse Pandey decided against sending Plaintiff for additional medical

---

**affected person**. Permanent paralysis and other serious complications can result." (emphasis in original)).

evaluation. The first is the type of failure to alleviate risk which the Supreme Court described as "no cause for commendation" but not "the infliction of punishment." *Farmer*, 511 U.S. at 838. The second is an example of gatekeeping, as Nurse Bass conveyed information to Nurse Pandey, who had greater treatment authority. Plaintiff does not plead that Nurse Bass delayed or refused to fulfill her gatekeeper role and thus does not describe the requisite level of neglect needed to plausibly establish deliberate indifference. *See Self*, 439 F.3d at 1233.

## II. Turn Key

Governmental responsibility to provide medical care to prisoners is "well established by both Oklahoma statutory and federal law as well as by state jurisprudence." *HCA Health Servs. of Okla., Inc. v. Whetsel*, 173 P.3d 1203, 1205 (Okla. 2007). Under state law, "a sheriff has a statutory duty to provide medical care to prisoners and is responsible for the proper management of the jail and the proper conduct of the jail personnel." *Estate of Crowell ex rel. Boen v. Bd. of Cnty. Comm'rs of Cnty. of Cleveland*, 237 P.3d 143, 144 (Okla. 2010); 57 O.S. § 52. And under federal law, "[t]he Supreme Court has made clear that the provision of medical care by an independent contractor does not prevent finding a jail official liable under § 1983 . . . ." *Hollis v. Davis*, No. 13-CV-0590-CVE-FHM, 2014 WL 7184406, at *6 (N.D. Okla. Dec. 16, 2014) (citing *West*, 487 U.S. at 56).

While jail officials cannot entirely abdicate responsibility (and potential liability) related to providing medical care to inmates, they can contract out day-to-day operations to private health care providers like Turn Key, who in turn become subject to municipal liability under § 1983 through their contractual relationship with the officials. *West*, 487 U.S. at 56 ("The State bore an affirmative obligation to provide adequate medical care to [inmates]; the State delegated that function to [a contracted provider]; and [the provider] voluntarily assumed that obligation by

11

contract."); *Milo v. Cushing Mun. Hosp.*, 861 F.2d 1194, 1196-97 (10th Cir. 1988) (finding private corporation that managed hospital liable as state actor because liability ran with delegation of authority).

Municipal liability under § 1983 attaches for a violation of civil rights if the violation results from a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978).[5] This "official policy" requirement distinguishes the act of the municipality from acts of the employees of the municipality, as municipality liability cannot derive from a theory of respondeat superior. *Id.* at 691-92.

A plaintiff must establish three elements to prove municipal liability: an official policy or custom, causation, and state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). A policy or custom may include:

> (1) a formal regulation or policy statement;
>
> (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;
>
> (3) the decisions of employees with final policymaking authority;
>
> (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or

---

[5] An alternative theory of municipal liability derives from *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986), and its progeny. *See Lee v. Turn Key Health Clinics, LLC*, Case No. 18-CV-318-GKF-JFJ, 2020 WL 959243, at *6 (N.D. Okla. Feb. 27, 2020) (collecting cases). A *Pembaur* theory that "an action by an official with final policymaking authority is alleged to [have] establish[ed] the constitutional violation" is "*in addition to* the settled [*Monell*] method of showing that the entity's policy was the denial of a constitutional right." *Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1256 (N.D. Okla. 2015) (emphasis in original). Here, Plaintiff relies on a *Monell* theory. Dkt. No. 4 at 22.

> (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference[6] to the injuries that make be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations omitted). Still, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). He must show that "the municipality was the 'moving force' behind the injury alleged," meaning "the municipal action was taken with the requisite degree of culpability and [there was] a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

The Tenth Circuit issued an opinion during the pendency of this case addressing "some tension in [its] caselaw" and "demarcating the precise dividing line" between municipal liability and individual liability. *Crowson v. Washington Cnty., Ut.*, 983 F.3d 1166, 1196 (10th Cir. 2020). Where a "municipality's failures are the driving force behind a constitutional violation by a specific municipal employee," a municipal liability claim "may not be maintained without a showing of a constitutional violation by the [municipal employee]." *Id.* at 1187. Failure to train claims exemplify this kind of situation. *Id.* Logically, if "there is no underlying constitutional violation by a county officer, there cannot be an action *for failing to train or supervise [that] officer*." *Id.* at 1189 (quotation omitted) (emphasis in original).

---

[6] Deliberate indifference is defined differently regarding municipal and individual § 1983 defendants. In the municipal context, "the municipality [must have] actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and [it must] consciously or deliberately choose[] to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). In general, notice is "established by proving the existence of a pattern of tortious conduct," but occasionally it may be proven "if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* at 1307-08. This is a "stringent standard of fault," as a lesser burden on a plaintiff "would result in *de facto* respondeat superior liability on municipalities." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

A different situation presents itself when a plaintiff alleges "gross deficiencies in staffing, facilities, equipment, or procedures" such that inmates are "effectively denied access to adequate medical care." *Id.* at 1187 (quoting *Garcia v. Salt Lake Cnty.*, 768 F.2d, 303 308 (10th Cir. 1985)). The Tenth Circuit explained:

> [S]ometimes the municipal policy devolves responsibility across multiple officers. In those situations, the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation. Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two.

*Id.* at 1191. Thus, "even where no individual action by a single officer rises to a constitutional violation, a municipality may be held liable where the sum of its actions nonetheless violates [a] plaintiff's constitutional rights." *Id.*[7]

In sum, *Crowson* distinguished "between claims against a county premised on 'systemic failure' and claims dependent upon a 'predicate violation' by an individual defendant." *Bowlds v. Turn Key Health*, Case No. CIV-19-726-SLP, 2021 WL 354109, at *3 (W.D. Okla. Feb. 2, 2021). Plaintiff states a claim under both theories. He alleges systemic failures in Turn Key's procedures regarding assessment and treatment of emergent medical situations demonstrated by multiple situations within the span of four years where delayed or denied medical treatment allegedly led to permanent injury or death. He also alleges that Turn Key failed to train and supervise its staff,

---

[7] The *Crowson* court did not have jurisdiction to further examine the alleged systemic deficiency presented, as the case came before it on an interlocutory appeal. *Id.* at 1193.

including Nurse Janes and Nurse Pandey, regarding treatment of emergent situations.[8] These allegations are sufficient to nudge Plaintiff's municipal liability claim from possible to plausible.

## CONCLUSION

IT IS THEREFORE ORDERED that the motions to dismiss filed by Defendants Turn Key Health Clinics, LLC [Dkt. No. 10], Kerri Janes, RN [Dkt. No. 16], and Jyoti Pandey, FNP [Dkt. No. 21] are hereby DENIED.

IT IS FURTHER ORDERED that the motion to dismiss filed by Defendant Angel Bass, LPN [Dkt. No. 19] is hereby GRANTED.

Dated this 6th day of February, 2025.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE

---

[8] However, since Plaintiff does not state a claim against Nurse Bass, he cannot sustain a failure-to-train claim against Turn Key related to her. *Crowson*, 983 F.3d at 1189.